RATIGAN v. DECKARD SUPPLY CO.
et al.
No. 1483.

Circuit Court of Appeals, Tenth Circuit.
Aug. 30, 1937.

John H. Bruninga, of St. Louis, Mo. (Lyon & Lyon and Henry S. Richmond, all of Los Angeles, Cal., and Preston C. West, of Tulsa, Okl., on the brief), for appellant.

Arthur C. Brown, of Kansas City, Mo., and James R. Cole, of Tulsa, Okl., for appellees.

Before PHILLIPS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

BRATTON, Circuit Judge.

Reference will be made to the parties to this action, having for its purpose the restraint of further infringement of letters patent and an accounting for past infringement, as they appeared in the court below. The original bill, filed in 1933, charged infringement of four patents issued

to plaintiff. During the pendency of the action, plaintiff acquired by assignment patent number 1,582,224, issued to George H. Prout in 1926. An amended bill was thereafter filed which included a charge of infringement of that patent. The defenses were invalidity and noninfringement. The court found that one of the patents issued to plaintiff was invalid; that another was valid, but not infringed; and that the two remaining ones were valid and infringed. Defendants paid the fixed damages for such infringement and surrendered all offending devices then on hand; and neither party appealed from the provisions in the decree relating to such patents. Plaintiff relied at the trial upon claims 1, 2, 3, and 4 of the Prout patent. The court found such claims valid, but not infringed. Plaintiff appealed from that provision in the decree.

The patent relates to an improvement in apparatus used in the pumping of deep wells. The equipment long used in pumping deep oil wells includes a perpendicular Sampson post about eleven feet in heighth from the floor of the derrick on which a walking beam twenty-four to twenty-six feet in length is mounted. The rearward end of the walking beam is linked to a crank associated with a bandwheel. A hanger means at the forward end of the walking beam makes connection with a polish rod which extends through a stuffing box and for a short distance into the well at which point it connects with the sucker rod to which the pump is attached in the lower reaches of the well. As the walking beam oscillates, an upward and downward movement is transmitted to the polish rod, sucker rod and pump. The polish rod is a large steel rod, and it must fit closely into the stuffing box in order to prevent leakage. Since the point at which the hanger is mounted on the walking beam travels in the arc of a circle of a pivot at the fulcrum, that line departs from the vertical axial line of the well. As the length of the stroke is increased the degree of departure of the arcuate path from the axial line becomes greater. The result is that the polish rod is deflected or bent. The deflection or bending is repeated with each stroke and that causes fatigue and wear. In an effort to bring about vertical movement of the polish rod, the patent discloses a hanger mounted on the forward end of the walking beam with a trunnion and extending vertically downward. The hanger is divided into two sections pivotally hinged together. The lower part extends downward to a carrier-bar or support to which the polish rod is screwed by a clamp. The hinge or pivotal connection between the two parts of the hanger is substantially the horizontal plane passing through the fulcrum of the walking beam, or slightly below such plane. A fixture is attached to the underside of the walking beam with bolts or lag screws. It consists of a slot about two and a half or three inches in length. A strut means extends in a diagonal downward direction from the slot to the hanger. The upper or inner end of the strut is mounted on a pin which is disposed within the slot and forms an attaching point. The lower end is pivotally attached to the hanger with the shaft or pin that connects the upper and lower parts of the hanger stem. As the beam lifts, the weight of the sucker rod and the fluid being pumped is suspended on the trunnion at the end of the beam; but when the beam has passed a certain point in the course of the stroke, the pin in the upper end of the strut moves into contact with the bottom or rear of the slot, and guidance of the polish rod is thus transferred from the trunnion to the hinge pin connecting the upper and lower sections of the hanger stem. As the beam is lowered from a horizontal position, the strut moves forward in the slot and in that manner the point of suspension is restored to the trunnion. Operation of that kind is commonly called a straight-line hanger method.

Defendants began the manufacture of their first straight-lift hanger in 1930. In structure the stem consists of two sections joined with a hinge. The upper section is provided with a cross tee which rests on the top of the beam. A strut engages the upper section of the hanger near its lower end by means of a socket. The other end of the strut engages the lower end of a back brace by means of a socket. The upper end of the back brace is arranged to engage the walking beam at a point adjacent to the cross tee. The strut has a spring which permits movement of about two and a half inches. In operation, the back of the back brace engages the beam on the upward stroke and thus transfers guidance of the polish rod from the cross tee to the point at which the strut engages

the hanger stem through the socket connection. This type of device was manufactured for about six months, and about fifteen or twenty of them were sold. The manufacture of them was then discontinued because of certain undesirable features. The manufacture of the second type of hanger was begun soon after discontinuance of the first. It is quite similar to the former type, except that the strut and back brace arrangement forms a part of a separate unit consisting of four or five parts. It has a secondary bar back of the upper section of the stem. The secondary bar is connected with the beam at the top by means of a beam plate and it is connected at the bottom with the upper section of the hanger stem. The diagonal strut is connected with the secondary bar at its lower end. The other end of the strut is connected with the third member or back of the brace, which is attached at its upper end to the secondary bar near its top. In like manner the back of the brace comes in contact with the beam on the upward movement. The next type manufactured is quite similar to the one just described, except that the secondary bar is omitted, the strut is connected at its lower end directly to the lower end of the stem and at its upper end to the lower end of the back brace, and the back brace is connected at its upper end with the beam near the cross tee. The next type need not be discussed at length because its manufacture was discontinued without it going into commercial use. It includes a back brace connected with the walking beam at its lower side and has a turnbuckle arrangement. The remaining type has a vertical stem suspended from the walking beam by means of a cross tee. Two strut parts are connected at their lower end with a crossbar which in turn is pivotally connected to a bearing at the lower end of the hanger stem. The strut parts extend diagonally upward from their connection with the crossbar to the top of the walking beam, one being on each side of the beam. There is a plate on the top of the beam held in position with four J bolts. There is a slot in the plate. A crossbar on the side reins drops into the slot and is held securely in the pocket of the slot with an eye bolt that goes around the crossbar. The operating purpose of this type is to transfer guidance of the polish rod on the upward movement of the walking beam, from the cross tee to the point at the lower end of the hanger stem.

The essence of Prout's improvement is the hanger stem consisting of two parts hinged together with a shaft, and the strut means with one end positioned in the slot in the fixture attached to the interior of the walking beam and the other end pivotally attached to the hanger at the point where its two parts are hinged together. Issuance of the patent created a presumption of patentable invention. Skinner Bros. Belting Co. v. Oil Well Improvements Co. (C.C.A.) 54 F.(2d) 896; Callison v. Dean (C.C.A.) 70 F.(2d) 55. None of the prior patents sets forth the conception of the claims in suit; and hence the claims must be sustained in respect to their validity.

The question of infringement remains. The file wrapper discloses that claims 2 and 3 in the application read:

"2. In a sucker rod hanger arranged to maintain substantial alignment of the polish rod, the combination of hanging means extending vertically downwardly from the end of a walking beam, and a strut extending between the lower end of said hanging means to an interior point on said walking beam, and means permitting a limited movement of said strut.

"3. In a sucker rod hanger arranged to maintain substantial alignment of the polished rod, the combination of hanging means extending vertically downwardly from the end of a walking beam, and strut means extending between the lower end of said hanging means and an interior point on said walking beam, said strut means being arranged to provide a relatively small relative movement between the lower end of said hanging means and said interior point on said walking beam."

These claims were rejected because of an existing patent issued to Chapman. Claim 2 was then amended to include a shaft in the hanging means; to provide that the strut should be a rigid diagonal one, that it should be pivotally connected to the shaft, and that instead of the strut extending between the lower end of the hanging means and an interior point on the walking beam, it should extend from the shaft to the interior point on the beam. Claim 3 was similarly amended to avoid the reference. It then included a pivotal connection of the strut to the hanging means arranged to provide a relatively small movement between the lower end of the hanging means and the interior

point of the walking beam. As thus amended the claims were allowed and they are claims 1 and 2 in the patent. The first and second types of devices constructed by defendants did not have a rigid strut pivotally connected to a shaft and extending from such a connection to the walking beam. In the first type it was connected with the hanger stem by means of a socket, not a shaft; and it does not engage the walking beam. In the second type, the strut is connected with a secondary bar by means of a pin, not with a shaft in the hanger stem; and it does not engage the walking beam. In each instance the end of the strut adjacent to the beam connects with a back brace. The strut and the brace follow the hanger stem. In the oscillating movement of the walking beam, the back brace engages and disengages the beam. One witness referred to such engagement as the brace slapping against the beam. In neither type does the strut means extend to the beam. The third type bears substantially the same departure from the teachings of the claims.

In neither the type with the connection at the bottom of the walking beam and having the turnbuckle arrangement, nor in the remaining type, does the strut means engage the interior of the walking beam in the course of movement; and means for limited movement of the strut is not provided. The strut means consists of two radius rods which extend along opposite sides of the walking beam and are anchored in a bracket attached to the top of the beam. A witness for plaintiff testified that on one occasion he observed movement of the strut means at the top of the beam during actual operation of the device in the field; but there was other testimony that the construction is rigid in type with no movement intended, and the structural details tend strongly to support that view. It was suggested that the movement which the witness observed may have resulted from use and wear. In any event, the trial court resolved the issue against plaintiff, and serious mistake in considering the evidence does not appear.

The finding that the device is rigid must, therefore, stand.

It is contended that the several devices described constitute substantial equivalents to the claims and for that reason infringe. Where an applicant is compelled by rejection of his application to narrow his claims by the introduction of a new element in order to secure his patent, he is bound by the narrowed claims and cannot subsequent to the issuance of the patent broaden them by dropping the element which he was thus required to include. Hubbell v. United States, 179 U.S. 77, 21 S. Ct. 24, 45 L.Ed. 95; Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707. The introduction of the new elements in claims 1 and 2 must be treated as material. The devices are different from the teachings of the claims in substantial respects. They do not accomplish substantially the same result in substantially the same manner.

Coming to claims 3 and 4, they provide for a fixture having a slot, mounted on the walking beam on its interior side and a strut member connected with the slot member by means of a pin. In addition, claim 4 requires that the strut means be connected pivotally with the hanger. None of the alleged offending devices has elements which are substantially comparable to the prescribed fixture with a slot mounted on the interior side of the walking beam to which the strut is connected by means of a pin; and neither of them has a strut pivotally connected with the hanger stem.

The mere function of plaintiff's strut arrangement with the slot and pin is not patentable. It is elementary that a patent insures against another doing substantially the same thing in substantially the same way. Demco v. Doughnut Mach. Corporation (C.C.A.) 62 F.(2d) 23. The devices under challenge do not accomplish substantially the same thing in substantially the same way as that taught in claims 3 and 4. The result is alike, but there is no substantial identity in means.

For the reasons indicated, the decree is affirmed.